***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Edward Garner, Jr. and the briefs and oral arguments before the Full Commission and found that the appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioner's Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the initial hearing as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the plaintiff and defendant at all relevant times.
3. Plaintiff's average weekly wage is $655.88, yielding a compensation rate of $436.82.
4. Plaintiff is contending that he is entitled to benefits for an alleged occupational disease(s) related to chemical exposure in his work place with defendant.
 ***********
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACTS
1. Plaintiff, born January 5, 1945, has a seventh grade education. Plaintiff was employed by the City of Raleigh as an auto body repairman between November 5, 1975 and May 3, 1996. Plaintiff's job required him to repair or replace damaged auto body parts on vehicles owned by defendant. The job included estimating the damage, ordering parts, repairing parts, and, if necessary, painting of all or portions of the vehicles.
2. Plaintiff was in good health and had no breathing problems when he began working for defendant. Plaintiff said there had never been any asthma or breathing problems in his family. Plaintiff worked in a two-car garage repairing vehicles and getting them ready for painting. The painting room was next door to the garage. Plaintiff worked in this same location throughout his employment with defendant. Plaintiff also had to do body work on vehicles which would include removing dents, filling with body putty, sanding the body putty and vehicle to prepare the vehicle for new paint.
3. The painting room was approximately 40 feet by 60 feet with a large painting booth inside. Vehicles are driven into the paint booth. Once in the booth, the doors are closed and the vehicle is painted. The only ventilation in the paint booth when Plaintiff began work with defendant was "a big stack going up through the roof like a chimney." Plaintiff would use a paint gun that holds one quart of paint and has an air hose and trigger attached and "it just blows the paint."
4. Plaintiff painted approximately two cars per week. Each car would require three coats of paint with each coat taking approximately 20 to 30 minutes to apply. Plaintiff would have to allow 20 to 30 minutes drying time before applying the other coats of paint.
5. The paint booth was used most of the time for painting. However, between 1975 and 1981, painting would sometimes be done in the body shop during the colder months of winter since there was no heat in the paint booth. There was no ventilation in the body shop area until sometime in 1981 or 1982 when an exhaust fan was installed. Around 1985, after heaters were installed to blow warm air into the paint booth, plaintiff stopped painting in the body shop.
6. Plaintiff wore a mask that covered the nose and mouth when painting. Plaintiff testified to having continuous trouble with the mask slipping around his nose and allowing the paint fumes to enter the mask. Plaintiff's coworker, Vernon Cummings, and a supervisor tried to help plaintiff adjust the mask so it would fit properly, but plaintiff continued to have trouble with the mask in the nose area.
7. Plaintiff also had exposure to the paint on the remainder of the face that was not covered by the mask. In the summer months when it was very warm, plaintiff would work in short-sleeve shirts which left his hands and arms exposed to the paint. Plaintiff was provided disposable, light-weight coveralls by defendant around 1991 to provide protection when painting.
8. Plaintiff was exposed to paints and solvents, including DXR80, a urethane hardener made by PPG which mixes with the paint to make it harder and more durable. Plaintiff also used Sherwin-Williams product V6V241, a medium solids hardener.
9. Around 1989, following an OSHA inspection, an exhaust fan was installed in the body shop and, subsequent to that, heat was provided for the painting room. In 1995, defendant provided a full-face mask that supplied fresh air while you paint.
10. Plaintiff first noticed he was having memory problems in 1988 or 1989 when he started having his damage estimates for vehicles sent back by the front office because they were not completely filled out or were incorrect. Plaintiff also had trouble remembering where he parked and began to have trouble being in crowded places. Plaintiff's wife testified that plaintiff had never had breathing problems prior to working with defendant and that plaintiff began to get forgetful and confused at times in the early 1980's. She testified that she could tell when he had been painting at work by the paint smell on his clothes and the smell of paint fumes on his breath when he exhaled. Plaintiff would have a foggy blue tint from the paint across the bridge of his nose and all over his hands and arms when he came home from work on days he had been painting cars.
11. Dr. Mason testified, and the Full Commission finds as fact, that diisocyanate compounds used as paint hardeners can be absorbed through the skin as well as be inhaled, resulting in direct injury to the lungs and can cause damage to target organs such as the central nervous system and brain. The inhaled materials diffuse through the lung tissue into the blood which carries them to the central nervous system. These materials have a high lipid solubility and the central nervous system, the target organ in this case, has excellent blood flow and a high lipid content which allows these materials to effectively solubilize into the central nervous system.
12. The central nervous system serves as a short-term immediate repository for these materials and quite high concentrations can be reached on an acute administration according to Dr. Mason. The paint sprayed by plaintiff was in aerosol form, which means the material is still in liquid form, but that the particles are so small they are suspended in air. These particles or droplets contain very high concentrations of the product itself.
13. The Material Safety Data Sheets referenced Dr. Freedman's deposition and in the Duke University Medical Center records for the product called DXR-80, which plaintiff was exposed to, indicate: Inhalation. Vapor and spray mist harmful if inhaled. May cause irritation and/or allergic respiratory reaction in lungs. Vapor irritates eyes, nose and throat. Repeated exposure to high concentrations may cause irritation of the respiratory system and permanent brain and systemic damage.
14. Dr. Mason testified, and the Full Commission finds as fact, that damage from severe and acute exposures to the diisocyanates may manifest acute effects even though they may not be immediately apparent and there may be low-level exposures on a continuing basis with chronic effects occurring long after the initial exposure.
15. Plaintiff was seen at Duke University Medical Center by Dr. Saltzman, a pulmonary specialist. Dr. Saltzman assessed plaintiff with allergy related problems: rhinitis, asthma, Isocyanate precipitation of aggravation of asthma. Dr. Saltzman instructed plaintiff not to work around isocyanates.
16. Encephalopathy is a disorder of brain function and toxic encephalopathy is due to external toxins in the environment and which are usually ingested. Typical symptoms of an external toxic encephalopathy condition would be decreased concentration, excitability, various motor and sensory disturbances, movement problems, movement problems that look like Parkinson's disease, as well as behavioral and psychological changes in personality and irritability. These symptoms result from toxins getting into the body fat from inhalation, contact through the skin, or ingestion.
17. There are three types of toxic encephalopathy. Type one has symptoms of fatigue, impaired concentration, loss of initiative, and things of that nature, but they are fully reversible. Type two involves more subtle neurological changes as well as changes in mood and personality, and it is not known if the symptoms are reversible or not. Type three results from significant exposure over a long period of time and includes behavioral and cognitive changes as well as abnormalities seen on neuroimaging studies. Type three is irreversible. Dr. Williams testified, and the Full Commission finds as fact, that plaintiff has type three toxic encephalopathy with irreversible neurobehavioral symptoms and radiologic abnormalities.
18. Dr. Mark E. Williams further testified, and the Full Commission finds as fact, that plaintiff's changes in cognitive function and behavior were caused by his repeated exposure to diisocyanate and other potentially toxic chemicals in his employment with defendant.
19. Dr. Williams cited several bases for his opinion including plaintiff's history of extensive exposure to solvents without suitable protection; his pattern of illness, including changes of memory and cognitive function, behavior changes, and increasing isolation and suspicion; plaintiff's symptoms that are consistent with exposure such as lung disease and respiratory illnesses; and plaintiff's dementia, which was clearly different from the more common types of dementias such as Alzheimer's disease. He went on to state that Alzheimer's disease is a disease that occurs in old age and plaintiff presented at age 52 with a ten year history. Dr. Williams went on to say that, "to just say this is Alzheimer's disease and nothing else starting this young — I mean, he was 52 when he came in and he had a 10-year history before that — it would be quite striking."
20. Dr. Mason and Dr. Williams testified, and the Full Commission finds as fact, that plaintiff's exposures to solvents in his workplace placed him at an increased risk of developing his disease as compared to the public in general.
21. Dr. Williams found, and the Full Commission finds as fact, that plaintiff was totally disabled and that the damage to plaintiff's nervous system is permanent and could progress some as plaintiff ages. Dr. Williams, when asked about the need for attendant care, responded: "Well, I think he's going to need some supervision and assistance and I think over time — and I can't be more specific because the progression of dementia is predictably unpredictable." Dr. Williams went on to say the supervision would be needed to assist plaintiff in being aware of the risks in the environment because plaintiff may be unable to control himself if he were to get into a position where he felt threatened. He went on to say that plaintiff may require additional supervision as the symptoms progress.
22. Stephen Carpenter, a rehabilitation counselor, found plaintiff to be totally disabled and unemployable since May of 1996. Mr. Carpenter said trying to place plaintiff in a job would be a waste of time because of the severe loss of cognitive function. Plaintiff did poorly on reading, spelling, and mathematical testing with results in the range of a fourth and fifth grade level. Plaintiff is marginally to functionally illiterate and just based on age and education, plaintiff has significant vocational loss. Plaintiff's biggest impairment to employability is his loss of mental function capacity and inability to sustain concentration and attention necessary for working a normal eight-hour day.
23. The Full Commission places more weight on the testimony of Dr. Williams and Dr. Mason than that of Dr. Freedman and Dr. Allen Hayes. Dr. Hayes indicated limited knowledge regarding paint hardeners and solvents and their effect from a pulmonary standpoint. Dr. Freedman came up with an alternative theory and cited the possibility of multiple strokes as the cause of plaintiff's problems even though he took no history from plaintiff after he failed to find available literature on neurological problems associated with exposure to paint hardeners and solvents. Dr. Freedman did not agree with labeling plaintiff's problems as toxic encephalopathy, but then stated, "Call it what it is. It's dementia, which is coming from — from toxic exposure."
24. Plaintiff's job with defendant placed him at an increased risk of developing toxic encephalopathy as compared to the public in general and his condition is due to causes and conditions characteristic of and peculiar to his employment and is not an ordinary disease of life to which the public is equally exposed. The chemical exposures plaintiff was subjected to in his employment with defendant caused him to develop toxic encephalopathy resulting in loss of cognitive functioning and behavioral changes.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's toxic encephalopathy was caused by and due to causes and conditions characteristic of and peculiar to plaintiff's employment with defendant. Plaintiff's toxic encephalopathy is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's lung disease and dementia were caused, or significantly contributed to, by his exposure to diisocyanates and other chemicals during his employment with defendant.
3. Plaintiff is entitled to have defendant pay permanent and total disability compensation at the rate of $436.82 per week for the period of May 6, 1996 and continuing for the remainder of his lifetime or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
4. As a result of his occupational disease, plaintiff is entitled to have defendant pay for all medical expenses incurred during his lifetime which is reasonably necessary to provide relief, effect a cure or lessen the period of his disability. N.C. Gen. Stat. § 97-25.
5. The plaintiff is entitled to payment of interest at the rate of eight (8%) percent on the final award or unpaid portion thereof from the date of the initial hearing of the claim. N.C. Gen. Stat. § 97-86.2.
 ***********
Based on the foregoing Stipulations, Findings of Facts, and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff permanent and total disability compensation at the rate of $436.82 per week for the period of May 6, 1996 and continuing for the remainder of his lifetime or until further Order of the Commission. From the amounts having accrued, this compensation shall be paid to plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. Defendant shall pay for all medical expenses incurred during plaintiff's lifetime which are reasonably necessary to provide relief, effect a cure or lessen the period of his disability from his compensable occupational disease.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendant shall pay plaintiff interest at the rate of eight (8%) percent on the final award or unpaid portion thereof from the date of the initial hearing of this claim.
4. Defendant shall pay the costs.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER